**HUDSON VALLEY BROADCASTING
CORPORATION, Appellant,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,**
Dutchess County Broadcasting Corpora-
tion, Intervenor.

No. 17310.

United States Court of Appeals
District of Columbia Circuit.

Argued April 15, 1963.
Decided June 6, 1963.

Mr. Jerome S. Boros, New York City,
of the bar of the Court of Appeals of
New York, pro hac vice, by special leave

of court, for appellant. Mr. Peter Shuebruk, New York City, was on the brief for appellant. Messrs. Herbert M. Schulkind and Joseph J. Kessler, Washington, D. C., also entered appearances for appellant.

Mrs. Ruth V. Reel, Counsel, Federal Communications Commission, for appellee. Messrs. Max D. Paglin, Gen. Counsel, Daniel R. Ohlbaum, Assoc. Gen. Counsel, and Alan D. Reffkin, Counsel, Federal Communications Commission, were on the brief for appellee. Mr. Herman I. Branse, Counsel, Federal Communications Commission, also entered an appearance for appellee.

Mr. Aloysius B. McCabe, Washington, D. C., with whom Mr. Reed T. Rollo, Washington, D. C., was on the brief, for intervenor.

Before BAZELON, Chief Judge, and BURGER and WRIGHT, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge.

For many years the Federal Communications Commission has maintained a rule that commonly owned radio stations will not be licensed to serve the same area.[1] The Commission has described this rule as one of its "basic policies."[2] In 1958 the Commission adopted the policy of encouraging all Class IV stations to increase transmitter power to a maximum of 1,000 watts.[3] It has termed

implementation of this policy a "consideration overriding other considerations which would ordinarily be of decisional significance."[4] This case arises out of a conflict between these two policies.[5]

### I. Background

The Commission in 1958 became concerned that the lower-powered Class IV[6] stations were not providing a satisfactory signal to the areas they were designed to serve. Several reasons appeared. Background electrical noise levels were increasing. Suburbs were spreading out, enlarging the size of the areas to be served. The Commission decided that the best solution to the problem of providing effective Class IV service would be to encourage all Class IV stations to increase transmitter power to the 1,000-watt maximum power permitted that class of station.

It was immediately recognized that for some stations a simple increase in transmitter power would result in violation of other Commission rules. The Commission decided against a blanket waiver of conflicting rules and declared it would adjust each conflict on a case-by-case basis.[7] Subsequently, the Commission resolved several of these conflicts. In 1960, in rule-making proceedings, it adopted a blanket waiver of the so-called 10 per cent rule which would otherwise prohibit the grant of an application if

1. 47 C.F.R. § 3.35 (Supp.1962), which provides in pertinent part:
   "No license for a standard broadcast station shall be granted to any party (including all parties under common control) if:
   "(a) Such party directly or indirectly owns, operates or controls another standard broadcast station, a substantial portion of whose primary service area would receive primary service from the station in question, except upon a showing that public interest, convenience and necessity will be served through such multiple ownership situation; * * *."

2. Paul A. Brandt, 19 R.R. 42, 42b (1960).

3. Power Limitation of Class IV Stations, 17 R.R. 1541 (1958).

4. Dutchess County Broadcasting Corp., 24 R.R. 223, 224 (1962); New Iberia Broadcasting Co., 23 R.R. 825, 826 (1962).

5. Dutchess County Broadcasting Corp., supra, Note 4.

6. The Commission's rules define various classes of standard broadcast (AM) stations and specify the purpose for which each is intended. Class IV stations operate on local channels and are designed to serve a city or town and the suburban or rural areas contiguous thereto. 47 C.F.R. §§ 3.21(c) (1), 3.182(a) (4) (Supp.1962). Six frequencies have been designated for Class IV facilities and approximately 1,100 stations are now operating on these channels.

7. Power Limitation of Class IV Stations, supra, Note 3, at 1544–1547.

the station would receive interference affecting more than 10 per cent of its primary service area.[8] In 1961 it adopted a rule providing for the simultaneous processing of Class IV transmitter power increase applications involving mutual interference, and automatic waiver of minor co-channel interference violations.[9]

In the first Class IV applications involving the overlap of commonly owned stations, the Commission held hearings and issued detailed opinions, weighing the extent of the overlap against other factors.[10] However, in New Iberia Broadcasting Co., supra, Note 4, and in the present case, the Commission abandoned that approach and held the power increase policy to be paramount without a hearing and without discussion of the facts in the particular case.

## II.  This Case

Radio Stations WGNY of Newburgh, New York, and WKIP of Poughkeepsie, New York, about 15 miles away, intervenor here, are commonly owned. An overlap of coverage had been waived at the time they came under common ownership. Immediately prior to the application here in suit the overlap amounted to 210 square miles containing 40,181 persons.[11] In 1961 WKIP, a Class IV station then operating at a power of 250 watts from a rooftop antenna, made ap-

plication to increase transmitter power to 1,000 watts and to move its antenna to a ground location 2.25 miles away. According to the figures used by the parties, if this application were granted the overlap would be increased to 570 square miles or 80,646 persons, approximately double the pre-existing overlap.[12] Petitioner, operator of a competing station in Poughkeepsie, filed a petition to deny this application on the ground that it violated the Commission's rule on overlap of coverage of commonly owned stations.[13] Petitioner also requested a hearing on the application, alleging many facts tending to show the integrated nature of the communities of Poughkeepsie and Newburgh, making the overlap particularly undesirable. WKIP responded, admitting the overlap but generally contradicting the other factual allegations.

The Commission denied the application for a hearing and granted the WKIP application in its entirety. No findings of fact were made beyond a passing recognition that overlap would result. The Commission relied entirely upon the so-called Class IV policy, declaring that its effective implementation required that all stations be allowed to increase power equally, in the absence of "international considerations or other disqualifying matters." [14]

8. Amendment of 10 Per Cent Rule, 20 R.R. 1661 (1960).

9. Processing Procedure for Class IV Stations, 21 R.R. 1600 (1961).

10. Chief Pontiac Broadcasting Co., FCC 61–850, Mimeo 6610 (7/10/61); Fredericksburg Broadcasting Corporation, FCC 60–1291, Mimeo 95411 (11/7/60).

11. Station WGNY had recently received permission to increase power which had the effect of increasing the overlap. However, that award was not appealed and the overlap resulting is not in issue here.

12. These figures are based on the .5 mv contours.

13. Pursuant to 74 Stat. 890–891, 47 U.S.C. § 309(d) (1).

14. The pertinent portions of the opinion are as follows:
"4. A grant of this application would increase the overlap of the 2 mv/m contours of WGNY and WKIP. However, WKIP is a Class IV station seeking to increase daytime power from 250 watts to one kilowatt.
"5. In amending its rules May 28, 1958, and April 13, 1959, to permit the filing and processing of applications for increased power by Class IV stations, the Commission recognized that, in general, each station would serve additional population and no persons receiving service would be lost due to interference received due to similar increases in power by other Class IV stations. It was also recognized that Class IV channels are so crowded that an increase in power by one such station, in general, results in

Petitioner attacks the decision on two grounds: (1) the Commission failed to deal with the antenna change, an important part of the application, and (2) a hearing is required on the entire application to reconcile the conflicting overlap and power increase policies.

### III. The Antenna Change

■ Petitioner alleged, and it was not seriously denied, that of the thirteen-fold increase in radiated power which would result from the grant of this entire application, 80 per cent is due to the antenna change, and only 20 per cent to the transmitter power increase. Antenna changes of this magnitude under Commission regulations would constitute a "substantial change" in facilities, requiring publication of the application to afford opportunity to interested parties to file objections.[15] Petitioner filed objections based on the overlap rule which *prima facie* would require rejection of the application. But the Commission granted the application without a hearing in an opinion which never mentions the antenna change and cites no authority which is pertinent to antenna change applications.

The Commission in brief attempts to justify this *sub silentio* approval of the antenna change on the ground that "the

authority for Class IV stations to use power of 1 kilowatt daytime is based on an *assumption* that they have efficient antennas." (Emphasis supplied.) The record in this case is directly contrary. When it appeared that the new antenna installation would result in a violation of a Commission rule against co-channel interference, the Commission wrote WKIP and suggested that it modify its antenna from its proposed efficiency of 270 mv/m/kw to "a value which is consistent with that provided by the existing WKIP radiator" or 150 mv/m/kw.[16] Thus the Commission recognized that, even in relation to the Class IV power increase policy, other factors might require less than maximum efficiency antenna design.[17]

Intervenor contends that the Commission's Class IV decisions authorizing transmitter power increases also authorize antenna changes. It cites no authority for this proposition, and prior Commission Class IV opinions clearly authorize only transmitter power increases. Intervenor also argues that authority to increase power to 1,000 watts must by implication include authority to erect an antenna capable of transmitting at such power since Commission regulations prohibited operation at more than 500 watts from rooftop an-

---

interference to other such stations unless they too increase power. In some cases, these increases in power result in service to areas which receive service from another station in which the applicant has interest. On the other hand, much of the additional area that might otherwise be gained by a Class IV station increasing power will actually be lost due to interference from other such stations unless they too increase power. Thus, the success of the general plan to permit Class IV power increases depends upon an implementation of the plan to the greatest degree possible. Accordingly, when a Class IV station is not precluded from increasing power by international considerations or other disqualifying matters, the Commission has regarded the goal of general implementation as a policy consideration overriding other considerations which would ordinarily be of de-

cisional significance. [Citing New Iberia Broadcasting Co., supra, Note 4.]

"In view of the foregoing, it appears that a hearing would serve no useful purpose; that no substantial or material questions of fact have been presented by the petition; and that a grant of the above-captioned application would serve the public interest, convenience, and necessity."

15. 47 C.F.R. § 1.547(c) (Supp.1962).

16. WKIP obtained waivers from the other stations and was permitted to retain the most efficient design.

17. It appears that far from automatically approving antenna changes which would conflict with other rules, the Commission required that *existing* antennas be modified to avoid conflicts. See Processing Procedure for Class IV Stations, supra, Note 9, at 1602–1603.

tennas.[18] The opinion of the Commission issued in the first rule-making proceeding concerning the Class IV stations shows the fallacy in this argument. There the Commission specifically noted that many other Commission regulations, of which the rooftop power limitation was only one, would bar some stations from increasing power, but rejected any blanket waiver of conflicting rules.[19] Since that time the Commission has not adopted any general rule on antennas as related to transmitted power increases and it did not make a specific public interest determination here.

Section 309(a)[20] of the Communications Act requires the Commission to determine whether the grant of an application would serve the public interest, convenience and necessity. Since the Commission opinion does not even advert to the antenna portion of the application, which portion raises clear public interest issues, this matter must be remanded to the Commission for appropriate action.

## IV.

■ There is a more basic objection to the Commission's disposition of this application. The Commission, in denying a hearing, relied upon § 309(d)(2) of the Act which provides:

"If the Commission finds on the basis of the application, the pleadings filed, or other matters which it may officially notice that there are no substantial and material questions of fact and that a grant of the application would be consistent with subsection (a) of this section, it shall make the grant, deny the petition, and issue a concise statement of the reasons for denying the petition,

which statement shall dispose of all substantial issues raised by the petition. If a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent with subsection (a) of this section, it shall proceed as provided in subsection (e) of this section." [21]

Thus, to grant an application without a hearing, the Commission must find (1) no material issues of fact, and (2) no reason why the grant would not serve the public interest, convenience and necessity. If the Commission concludes that these criteria are met, it shall grant the application with a "concise statement" of the reasons for denying the petition to deny. This section is intended "to afford the Commission an opportunity to dispose of those petitions which [are] of no real consequence." [22] We do not think the Commission's action here is consistent with the requirement of the statute.

■ We turn first to the problem of issues of fact. The parties made widely divergent factual allegations, but the Commission made no findings of fact.[23] The opinion merely states there are "no material issues of fact." The Commission's brief in this court indicates that the Commission did not accept all the factual allegations of the parties. Rather it apparently chose among them. Its brief contains a composite statement of facts selected from the pleadings which it asserts support the grant of the application. Facts militating against the grant are dismissed as "not important." Obviously, counsel cannot perform the

18. 20 F.R. 9079 (1955). Such installations are still not encouraged. 27 F.R. 6882 (1962); Rooftop Antennas, 23 R.R. 1574 (1962).

19. Power Limitation of Class IV Stations, supra, Note 3, at 1544–1547.

20. 74 Stat. 889, 47 U.S.C. § 309(a).

21. 74 Stat. 892, 47 U.S.C. § 309(d) (2).

22. H.R.Rep. No. 1800, 86th Cong., 2d Sess., p. 9, reprinted in 1960 U.S.Code Cong. & Adm.News 3516, 3520, U.S.Code Cong. & Adm.News, 1960, pp. 3516, 3520.

23. The parties agreed only on the extent of the overlap. Other facts, such as the relationship of the two cities, remained in dispute.

fact finding function for the Commission. Nor can we assume that the facts submitted by its counsel are the facts on which the Commission acted.[24]

■ Turning to the second criterion, the issue is whether the Commission could determine, without the aid of adversary presentation, that the grant of this application would serve the public interest, convenience and necessity. The Commission here contends that it could, arguing (1) that the overlap policy is relatively unimportant, and (2) that the Class IV power increase policy is more strongly in the public interest. However, all Commission precedent is contrary.

The policy against common ownership of overlapping stations was promulgated in rule form in 1943.[25] The regulation puts the burden on the applicant to show that an application involving overlap is in the public interest. The Commission has very stringently applied the regulation. For example, final decisions have been vacated and new hearings set where overlap problems were belatedly discovered.[26] An application which would have brought an area its first local service, and the second night service of any sort, was denied as violative of the overlap rule.[27] In the first two Class IV applications to raise overlap questions, hearings were held.[28] The Commission is presently conducting a rule-making proceeding to further strengthen the rule against overlap.[29] In this latter proceeding, incidentally, the Commission only *proposes* to do what it has in effect done here, *i. e.,* exempt Class IV power increase applications from the rule.[30]

The Class IV power increase policy, in contrast, has always been subordinated to other Commission policies. As discussed *supra,* the Commission initially rejected a proposal for blanket waiver of conflicting rules. The Commission utilized a full rule-making proceeding before waiving the so-called 10 per cent rule. Where interference to other classes of stations was a possibility, directional antennas were required as a condition to expedited handling.[31]

We think that the overlap problem here requires a hearing to determine if the grant of the application would be in the public interest. 74 Stat. 892, 47 U.S.C. § 309(d)(2).

Remanded to the Commission for further proceedings in accordance with this opinion.

---

24. "The Commission's action cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the Act. There must be such a responsible finding." Securities & Exchange Comm. v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L. Ed. 626 (1943).

25. Note 1, supra.

26. Kansas Broadcasters, Inc., 23 R.R. 1112a (1963); Sheffield Broadcasting Co., 21 R.R. 514j (1962).

27. Paul A. Brandt, supra, Note 2.

28. See Note 10, supra.

29. 27 F.R. 6846 (1962).

30. The importance of this policy has also been emphasized by the courts. See Sunbeam Television Corp. v. Federal Communications Comm., 100 U.S.App.D.C. 82, 84, 243 F.2d 26, 28 (1957), and cases cited therein.

31. Processing Procedure for Class IV Stations, supra, Note 9, at 1602–1603.