807 F.2d 1038
 257 U.S.App.D.C. 123
 HEALTH AND MEDICINE POLICY RESEARCH GROUP, et al., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Metromedia Radio & Television, Inc., Fox Television
Stations, Inc., Intervenors.
 No. 85-1837.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 14, 1986.
Decided Dec. 23, 1986.
As Amended Jan. 8, 1987.
 
 Andrew Jay Schwartzman, with whom David W. Danner, Washington, D.C., was on the brief, for appellants.
 David Silberman, Counsel, F.C.C., with whom Jack D. Smith, General Counsel, and Daniel M. Armstrong, Associate General Counsel, F.C.C., Washington, D.C., were on the brief, for appellee.
 Howard M. Squadron, New York City, of the Bar of the United States Supreme Court, pro hac vice by special leave of Court for intervenor, Fox Television Stations, Inc., Joel H. Levy, Brian M. Madden, Michael R. Gardner and James P. Denvir, Washington, D.C., were on the brief, for intervenor, Fox Television Stations, Inc.
 Thomas J. Dougherty and Gene P. Belardi, Washington, D.C., were on the brief, for intervenor, Metromedia, Inc.
 Before STARR and BUCKLEY, Circuit Judges, and GASCH,* Senior District Judge.
 Opinion for the Court filed by Circuit Judge STARR.
 STARR, Circuit Judge:
 
 
 1
 This case presents a challenge to the FCC's grant of a waiver from its crossownership rules in connection with the assignment of six television station licenses from Metromedia Radio & Television, Inc. to Fox Television Stations, Inc.[1] Specifically, the FCC granted Fox a temporary waiver from its rule prohibiting ownership of both a television station and a newspaper within the same geographical area, thereby providing Fox with a two-year period within which to dispose of its pre-existing ownership interest in the newspapers. Appellants, a consortium of individuals and public interest groups, unsuccessfully complained to the FCC that the upshot of a waiver would be to reduce the diversity of broadcast voices in the affected areas. This appeal followed. See 47 U.S.C. Sec. 402 (1982). Inasmuch as we are persuaded that granting the waiver was properly within the FCC's discretion, we affirm.
 
 
 2
 * The media empire that once was popularly known as Metromedia has now been largely dismantled. This case involves the sale of one significant portion of Metromedia's once proud stable of broadcast properties. In May 1985, Fox entered into an agreement with Metromedia to purchase seven of the latter's television stations in as many major U.S. cities, namely New York, Chicago, Los Angeles, Washington, D.C., Dallas, Houston, and Boston. See Joint Appendix (J.A.) at 377-85. Pursuant to this agreement, Metromedia and Fox filed applications for FCC approval of the former's assignment of its licenses to Fox in June 1985.[2]
 
 
 3
 In its application, Fox requested a waiver of the FCC's "cross-ownership rules," which, as their name suggests, prohibit (among other things) a broadcast licensee from owning a daily newspaper within the same area. 47 C.F.R. Sec. 73.3555(c) (1985). A waiver from the strictures of cross-ownership prohibition was necessary because Fox's owner, K. Rupert Murdoch, owned newspapers in two of the seven cities. Specifically, Mr. Murdoch controlled the New York Post and the Chicago Sun-Times, daily newspapers within the broadcast area of the New York and Chicago television stations.[3] In support of its request, Fox attached a twelve-page statement as to why a waiver would be in the public interest. Fox's primary contention was that a waiver would avoid a "distress sale" of the two newspapers, a recognized basis for waiver. J.A. at 28-39.
 
 
 4
 Fox's application in general, and its waiver request in particular, met with substantial opposition. Appellants filed a lengthy petition to deny, pointing out a number of alleged improprieties infecting Fox's application and, most relevantly to this appeal, asserting that granting a waiver would be inappropriate. See J.A. at 46-93. These arguments, and responses to them, were more fully developed through a series of oppositions, replies, and supplemental petitions. See, e.g., J.A. at 132-73, 178-202, 227-48. In particular, one of Fox's submissions set forth a further discussion supplementing its original twelve-page submission as to why waiver of the cross-ownership rules would be consonant with the public interest. J.A. at 151-66. Fox also attached to this submission a supporting affidavit from its investment banker (and board member) expressing the view that a waiver would be necessary to permit an orderly disposition of the two newspapers. J.A. at 170-72.
 
 
 5
 In due course, the FCC denied appellants' petitions. In addition to approving the Metromedia-Fox assignment, the Commission granted Fox a two-year waiver of the applicable cross-ownership rule. In re Applications of Metromedia Radio & Television, Inc., 59 Rad.Reg.2d (P & F) 1196 (1985).
 
 
 6
 After disposing of several points not germane to our purposes, the Commission turned to the waiver issue. The Commission first reviewed the arguments pressed by each party and then set forth the following conclusion:
 
 
 7
 [W]e believe [the cross-ownership rule] may be temporarily waived consistent with the public interest. The existence of the numerous media outlets serving New York, Chicago and surrounding areas supports our conclusion that no undue concentration of the media would result from a limited waiver. Further, we recognize that market factors associated with sales of daily newspapers may be different from those affecting broadcast properties making them more difficult to sell and therefore believe a waiver for a period of 24 months would be appropriate here. That period represents a reasonable balance between the policies expressed in the [cross-ownership] rule and our belief that, in divestiture cases, reasonable accommodations may be made to avoid the risk of distress sales.
 
 
 8
 59 Rad.Reg.2d (P & F) at 1205 (footnotes omitted). On appeal, the challengers, not surprisingly, take issue with the Commission's conclusion. Appellants' primary argument is that Fox made an inadequate showing to qualify for a waiver.[4]
 
 II
 
 9
 The FCC-granted waiver permits Fox to maintain, for a two-year period, a cross-ownership pattern that would otherwise be prohibited. 47 C.F.R. Sec. 53-3555(c) (1985). At bottom, the cross-ownership rules are designed to serve the public interest through encouraging diversity of media voices by requiring diversity of media ownership. The Commission was concerned about local media monopolies, where one individual or company owned some combination of a radio station, a television station, or a newspaper within the same area. To reduce the undesirable homogeneity of views that could presumably eventuate from such combinations, the Commission promulgated various proscriptions of media cross-ownership. For example, in 1970 the Commission prohibited ownership of both a radio and television station within the same area. See 47 C.F.R. Sec. 73, 3555(a) (1985); see also First Report and Order, 22 F.C.C.2d 306 (1970) (original promulgation of radio-television cross-ownership rules).
 
 
 10
 At the same time, the Commission proposed a similar ban on television-newspaper cross-ownerships. See Further Notice of Proposed Rulemaking, 22 F.C.C.2d 339 (1970). The rulemaking procedures for these television-newspaper rules continued for five years and culminated in January 1975 with the issuance of the regulatory predecessor to the current rule. See Second Report and Order, 50 F.C.C.2d 1046 (1975), aff'd sub nom. FCC v. National Citizens Commission for Broadcasting, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); id. at 1099, App. F (text of original cross-ownership rule). To limit the dislocations these cross-ownership rules would inevitably cause, the FCC "grandfathered" most then-existing combinations. Id. at 1080. The Commission indicated that these rules would "apply to new ownership patterns however created, whether by initial application and construction or by acquisition." Id. at 1076.
 
 
 11
 Notwithstanding the sweep of the cross-ownership prohibitions, the Commission expressly contemplated that waivers could be granted. The FCC established three specific instances in which a waiver would be appropriate, as well as a fourth, catch-all provision:
 
 
 12
 It is not our intention that the [cross-ownership] rules should work a forfeiture.... For this reason inability to sell the station would be a basis for waiver.... We would take a similar view if the only sale possible would have to be at an artificially depressed price. Likewise, if it could be shown that separate ownership and operation of the newspaper and station cannot be supported in the locality, waiver might well be appropriate.... Finally, if it could be shown for whatever reason that the purposes of the rule ... would be better served by continuation of the current ownership pattern, then waiver would be warranted.
 
 
 13
 Id. at 1085 (footnotes omitted).
 
 
 14
 Most significant for this appeal--since appellants' challenge addresses not the basis for the waiver but the sufficiency of Fox's showing--the Commission went on twice to opine on the type of showing it would require for waivers. First, in connection with waivers in the first category--that is, based on inability to sell--the Commission noted:
 
 
 15
 [T]here is a need to protect against a station being offered for sale at a price out of keeping with its true value so that the owners could seek waiver on the basis of the inability to dispose of the station. We expect the parties involved to proceed in good faith. In connection with any attempt to show the inability to dispose of an interest to conform to the rules, we shall not give any weight to a showing that does not include a full description of the effort made to sell that interest, the price at which it was listed and a certification of a station (or if it applies, newspaper) broker that in his view this price is consistent with the fair market value of the station (or newspaper) in question.
 
 
 16
 Id. at 1084 (emphasis added). Significantly, the Commission also discussed the type of showing required in the context of a distress sale. After observing that waiver would be appropriate "if the only sale possible would have to be at an artificially depressed price," id., the Commission set forth a footnote indicating that in such circumstances
 
 
 17
 [a]n appropriate showing would have to be made of the fair value and the inability to obtain such a price. Also, as with inability to sell at all, we do not contemplate permanent waiver, for problems in disposing of these interests would not be expected to endure indefinitely.
 
 
 18
 Id. at 1085 n. 46.
 
 
 19
 The FCC thus appears, albeit with less than crystalline clarity, to have established two distinct evidentiary standards for what it recognized as two distinct bases for waiver: inability to sell at all and ability to sell only at a depressed price. The first and more exacting showing relates to waivers sought on the basis of a complete inability to sell. That is as it should be; it is entirely reasonable for the Commission to look askance at claims of utter inability to divest a property and thus to require a substantial evidentiary showing to support such claims. The second description, set forth in footnote 46 (quoted above), is less exacting. It relates to waivers sought on the distress-sale-avoidance theory.[5] Accordingly, under the standards set out in the Second Report and Order, Fox was obliged only to make an "appropriate showing" as to the "fair value and the inability to obtain such a price" for the newspapers.[6]
 
 
 20
 In addition to the Second Report and Order itself, we have the guidance of the Supreme Court in affirming the Second Report and Order. In National Citizens Committee for Broadcasting, the Court noted that when the Commission's factual determinations "were primarily of a judgmental or predictive nature," 436 U.S. at 813, 98 S.Ct. at 2121, "complete factual support in the record for the Commission's judgment or prediction is not possible or required; 'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.' " Id. at 814, 98 S.Ct. at 2121 (quoting FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961)); see also Stereo Broadcasters, Inc. v. FCC, 652 F.2d 1026, 1031 (D.C.Cir.1981) (quoting National Citizens Committee ). We thus examine Fox's showing in light of the Supreme Court's teaching in National Citizens Committee, as well as the FCC's own description of the requisite showing.
 
 III
 
 21
 Appellants' primary contention, as we have seen, is that Fox's showing was inadequate to warrant a waiver. Before examining this showing, however, we pause briefly to describe the applicable standard of review and the degree of deference owed to the FCC's waiver determinations.
 
 
 22
 As all parties recognize, the Commission's decision is reviewable under the traditional and familiar "arbitrary and capricious" standard of the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A) (1982). See 47 U.S.C. Sec. 402(g) (1982). But the scope of review is particularly limited when the FCC engages in "the process of drawing lines, of making judgmental decisions." Stereo Broadcasters, Inc., 652 F.2d at 1031. In such circumstances, the Supreme Court has said:
 
 
 23
 Our opinions have repeatedly emphasized that the Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference.... Furthermore, diversity is not the only policy the Commission must consider in fulfilling its responsibilities under the Act. The Commission's implementation of the public-interest standard, when based on a rational weighing of competing policies, is not to be set aside by the Court of Appeals for "the weighing of policies under the 'public interest' standard is a task that Congress has delegated to the Commission in the first instance."FCC v. WNCN Listeners Guild, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981) (citations omitted) (quoting National Citizens Committee, 436 U.S. at 810, 98 S.Ct. at 2119). Bearing this narrow standard of scrutiny firmly in mind, we turn now to assess Fox's showing.
 
 
 24
 Fox's submissions to the FCC plainly invoked the "distress sale" basis for waiver of the applicable cross-ownership rule. In its initial application, for example, Fox maintained that a waiver would "promote the underlying pro-diversity purposes of the rules by reducing the prospects for a 'distress sale'...." J.A. at 31. But the evidence adduced by Fox in support of its distress-sale claim was, even charitably viewed, scant. It was offered in three separate submissions.
 
 
 25
 First, Fox attached its twelve-page "Public Interest Statement" to the original assignment application. This statement, to which we previously alluded, advanced the distress-sale basis for a waiver, but offered little by way of factual support for the claim. Instead, the statement discussed in general terms the difficulty of selling newspapers, particularly those that compete in markets with a dominant paper, such as New York City or Chicago. The statement also asserted that in the absence of a waiver, Fox might be forced to sell the two newspapers on terms and conditions unfavorable to their continued viability or, equally unfortunate, to sell the newspapers to their competitors. Either alternative of this Hobson's choice, Fox claimed, would lead to a reduction in diversity, a result contrary to the policies undergirding the cross-ownership rules. But again, all these assertions were grandly general in nature. See generally J.A. at 28-39.
 
 
 26
 Second, in its opposition to appellants' petitions to deny the waiver request, Fox again asserted the "distress sale" basis for waiver. See generally J.A. at 132-67. In support, Fox primarily directed the Commission's attention to its opinion in Crosby N. Boyd, 57 F.C.C.2d 475 (1976). See also supra note 6. In Boyd, the Commission granted a temporary waiver of the same television-newspaper cross-ownership rule that Fox finds inhospitable to its corporate designs. Boyd discussed at length the different market realities confronting newspapers, on the one hand, and television or radio properties on the other, and expressed grave concern lest the Commission's cross-ownership rule misguidedly sound a newspaper's death knell. 57 F.C.C.2d at 484. Boyd therefore constituted recognition, Fox claimed, that "as a matter of practical business realities, it takes a substantial amount of time to dispose of daily newspapers in major markets." J.A. at 164.
 
 
 27
 Third, Fox attached to its opposition to appellants' petitions to deny an affidavit from Stanley S. Shuman, J.A. at 170-72. Mr. Shuman, a member of Fox's Board of Directors, serves as Managing Director and Executive Vice-President of Allen & Company, a New York investment bank. According to the affidavit, Allen & Company enjoyed "extensive experience in the purchase and sale of various media properties" and had been "retained by [Fox] to prepare for the sale of The New York Post and the Chicago Sun-Times." J.A. at 171. Mr. Shuman goes on in the affidavit to offer the opinion that "a reasonable time must be allowed for orderly disposition of the publications in order to maximize the financial result and to insure the continued competitive viability of the publications." Id. The affiant then states that while Allen & Company had begun certain preparatory work, the firm had advised Fox that "it would be undesirable to approach prospective buyers or make any financial presentations until after the application for transfer of licenses has been approved by the Federal Communications Commission." J.A. at 171-72.
 
 
 28
 Our review convinces us that, although Fox's showing is nothing to crow about, it is sufficient to support adequately the FCC's determination. Two factors point decisively in Fox's favor: first, the comparatively lenient evidentiary standard that obtains with respect to distress-sale waiver requests[7] and, second, the high degree of deference owed by the judiciary to the Commission when it undertakes this sort of function.[8] Fox's submissions boil down to (1) the fact that the FCC in Boyd had recognized the difficulty of selling newspapers at reasonable prices, and (2) the contention that, in view of this already established phenomenon, Mr. Shuman's affidavit constituted an "appropriate showing" of inability to sell the newspapers at anything but "an artificially depressed price." Cf. Second Report and Order, 50 F.C.C.2d at 1085. In our view, the Commission's acceptance of this showing was, while by no means compelled, at least reasonable.
 
 
 29
 The FCC had previously noted in Boyd--albeit based there, we hasten to admit, on an elaborate factual showing of the newspaper's (the old Washington Star ) operating losses--the "harsh realities" facing newspapers competing against a dominant paper, and the difficulty of expeditiously selling such properties at anything save for depressed prices. 57 F.C.C.2d at 484. These market factors led directly to the Commission's waiver grant in Boyd. Accordingly, it was appropriate for the FCC to recognize that the New York Post and the Chicago Sun-Times faced these well-recognized market realities, and to permit this factor to weigh in the balance of its decision. In addition, the Shuman affidavit provided expert testimony that in the absence of a waiver there would be an "inability to obtain" a fair price. Cf. Second Report and Order, 50 F.C.C.2d at 1085 n. 46. We believe it was not unreasonable, and certainly not "arbitrary" or "capricious," for the Commission to deem this affidavit, together with the FCC's earlier recognition of newspaper market realities, an "appropriate showing" of an inability to sell at anything but an "artificially depressed price."[9] In light of our narrow scope of review and the deference rightly owing the Commission's determinations, we conclude that waiver was appropriate under the standards set out in the Second Report and Order.[10]
 
 
 30
 In reaching this conclusion, we observe, as did the Commission, that this waiver is unlikely adversely to affect overall media diversity in the New York City or Chicago areas. Both locations, as the reader might suspect, are blessed with a large number of media outlets. See In re Applications of Metromedia, 59 Rad.Reg.2d (P & F) at 1205; J.A. at 40-45. Moreover, Mr. Murdoch has pledged to maintain independent management of the newspapers and television stations at issue during the period of cross-ownership. See 59 Rad.Reg.2d (P & F) at 1205. Should a lack of diversity nonetheless result, the Commission is obviously able to take corrective action as seems necessary and appropriate. See id. (Commission has "adequate administrative remedies to assure compliance").
 
 Accordingly, the FCC's order is
 
 31
 Affirmed.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 The original assignee was News America Television, Inc. During the pendency of the application, News America Television, Inc. underwent a change, in name only, to Fox Television Stations, Inc. See Joint Appendix (J.A.) at 340. We refer to this entity throughout as "Fox."
 
 
 [2]
 This application sought assignment of the licenses of six of the seven stations. The seventh station was, in accordance with the parties' purchase agreement, assigned to a third party, The Hearst Corporation. J.A. at 377-78. The assignment to Hearst was approved by the FCC and is not at issue in this appeal
 
 
 [3]
 Prior to oral argument, Mr. Murdoch sold the Chicago Sun-Times. Accordingly, the issue of the propriety of a waiver for the Chicago cross-ownership is moot. The dispute remains, however, as to the New York cross-ownership
 
 
 [4]
 Appellants also raised in their brief, but did not press in oral argument, a contention regarding the FCC's ability to grant any waiver of its cross-ownership rules in this context. Specifically, they argued that the Commission lacks the ability to waive its rules in order to sanction new cross-ownership patterns. See Appellants' Brief at 21-23. Appellants repeatedly emphasize the allegedly unprecedented nature of such a waiver, failing, in our view, to come to grips with prior authorizations of new cross-ownerships in the analogous television-radio area. See, e.g., Gulf Broadcasting Co., 100 F.C.C.2d 238 (1984). One other recent case in the television-newspaper area also points in this direction, authorizing a new cross-ownership. See In re Golden West Assoc., LP, 59 Rad.Reg.2d (P & F) 125 (1985). Moreover, when it established the cross-ownership rules, the Commission expressly contemplated waiver for newly created combinations brought about through a television licensee purchasing a daily newspaper. Second Report and Order, 50 F.C.C.2d 1046, 1076 n. 25 (1975), aff'd sub nom. FCC v. National Citizens Committee for Broadcasting, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978). Finally, of course, appellants' argument runs afoul of the well-established proposition that "[t]he possible waiver of violations of agency rules is a question which is normally left to agency discretion." WSTE-TV, Inc. v. FCC, 566 F.2d 333, 338 (D.C.Cir.1977). In light of these authorities, we reject appellants' counter-intuitive, and indeed extravagant, suggestion that the Commission is unable ever to waive its rules. Nothing, we note, in the statute suggests that the Commission is rigidly handcuffed by its own rules in this respect
 
 
 [5]
 Indeed, the footnote itself recognizes a distinction from waivers sought by virtue of an inability to sell. See 50 F.C.C.2d at 1085 n. 46 ("as with inability to sell at all")
 
 
 [6]
 The applicability of this "appropriate showing" evidentiary standard to the distress sale context--as opposed to the more stringent inability-to-sell standard appellants seek to apply, see Appellants' Brief at 30-31--is confirmed by the FCC's two opinions concerning a proposed sale of the now-defunct Washington Star, together with a television station. See also infra p. 1044
 In the first Washington Star opinion, the Commission was handling the applicants' request for a permanent waiver of the cross-ownership rules. In such a setting, the FCC quite correctly quoted and applied the exacting evidentiary standard it had earlier set out for waivers based on an inability to sell. See Washington Star Communications, Inc., 54 F.C.C.2d 669, 673 (1975); Second Report and Order, 50 F.C.C.2d at 1084. The Commission's ultimate conclusion was that a hearing was required in order to assess fully the claimed inability to sell.
 Before such a hearing could be held, however, the applicants amended their submissions and sought only a temporary waiver. The Commission granted this request without holding a hearing. Although basing its decision on the fourth, catch-all basis for a waiver, the Commission referred only to the "appropriate showing" language, not the more exacting standard for inability to sell. See Crosby N. Boyd, 57 F.C.C.2d 475, 483 (1976) (quoting footnote 46 from the Second Report and Order ).
 
 
 [7]
 We acknowledge that the Commission's decision in this case did not discuss the varying evidentiary standards we have discerned from the Second Report and Order. While the Commission alluded to appellants' argument that a rigorous standard should apply to Fox's request, In re Applications of Metromedia Radio & Television, Inc., 59 Rad.Reg.2d (P & F) 1196, 1203 (1985), it did not necessarily accept this as the correct standard. Instead, the FCC simply concluded that a "reasonable balance" of competing policies called for a two-year waiver, id. at 1205, without mentioning which evidentiary standard it was applying. The decision is thus less than a model of clarity on the precise issue of the appropriate evidentiary showing for distress-sale waiver. Because, however, of the language from the Second Report and Order to which we have referred, see supra pp. 7-8, we can discern the agency's path and accordingly affirm rather than remand. See Bowman Transportation, Inc. v. Arkansas Best Freight Systems, Inc., 419 U.S. 281, 285-86, 95 S.Ct. 438, 441-42, 42 L.Ed.2d 447 (1974)
 
 
 [8]
 The FCC's Memorandum Opinion accepting this showing arguably evidences a more lenient tone than the Commission has previously employed in enforcing 47 C.F.R. Sec. 73.3555. This suggests the possibility that a potentially major policy shift may be in the offing, if not indeed underway; if that is so, then the agency in the future may well be obliged to grapple more directly with any such policy change. As this precise issue has not been brought before us, however, we have no occasion to address the merits of any such shift. Rather, we have addressed this case as it has been litigated, namely whether the Commission's actions are consistent with the pronouncements set forth in the Second Report and Order
 
 
 [9]
 Mr. Shuman's status as a member of Fox's Board of Directors does not somehow disqualify him from offering his views as an investment banker. Appellants' vague suggestions of dark and sinister motives animating such hired gun expertise need not detain us. Nothing in the record suggests that Mr. Shuman's opinion is tainted by his dual role or represents anything other than expert banking advice. Moreover, it goes without saying that the question of how much credit to give an expert's opinion is a matter entrusted to the agency's sound discretion
 
 
 [10]
 Appellants have advanced three additional arguments that can be readily resolved. First, they contend that even if a waiver may have been appropriate, the 24-month period that the Commission granted was too long. See Appellants' Brief at 44-45. But in determining whether a 6, 12, or 24 month period is appropriate, the Commission is engaging in classic "line-drawing," making judgments to which this court must generally defer. See Stereo Broadcasters, Inc. v. FCC, 652 F.2d 1026, 1031 (D.C.Cir.1981); see also FCC v. WNCN Listeners Guild, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981). We will not disturb the Commission's determination that 24 months was an appropriate period, in the absence of evidence as to why a shorter period would have achieved the same goals sought by the Commission in granting the waiver
 Second, appellants argue that the FCC was required to hold a hearing. See 47 U.S.C. Sec. 309(e) (1982). Not so. Section 309(e) requires a hearing only when there is a "substantial and material question of fact." Appellants' contention that such facts are presented in this case is, in reality, merely the flip side of their contention that Fox made an inadequate showing to qualify for a waiver. The Commission found otherwise, and we now uphold that decision. Moreover, "[t]his court has consistently recognized that FCC hearing determinations are entitled to substantial deference under these provisions [of the Communications Act]. 'The substantiality and materiality of purported issues of fact, and the need for further information are issues to be evaluated in the first instance by the Commission in the light of its public interest responsibility. This court's oversight role is quite limited.' " Eastern Carolinas Broadcasting Co. v. FCC, 762 F.2d 95, 105 (D.C.Cir.1985) (quoting United States v. FCC, 652 F.2d 72, 90-91 n. 87 (D.C.Cir.1980) (en banc )). Under this standard, reversal of the FCC's determination not to hold a hearing is painfully inappropriate.
 Third, appellants claim that Fox ought to be required to submit progress reports. The FCC's failure to explain why such a condition has not been imposed on Fox is, say appellants, arbitrary and capricious. Again we disagree. Imposition of a reporting requirement is soundly within the discretion of the FCC. Failure to impose this duty, a traditional exercise of line-drawing by the FCC, is not "patently unreasonable." Home Box Office, Inc. v. FCC, 567 F.2d 9, 60 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). The FCC explicitly conditioned the waiver on Fox's representation that operations would not be commingled. Further, "we [the FCC] have nothing before us to demonstrate that [Murdoch] will not abide by his representations to the Commission or that he will not comply with the Commission's Rules or its directives. In the event that our perception is proved incorrect, we have adequate administrative remedies to assure compliance." 59 Rad.Reg.2d (P & F) at 1205. See also Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC, 595 F.2d 621, 634-35 (D.C.Cir.1978) (en banc ) (agency entitled to rely on representation of licensees).